## DE MOSS v. UNITED STATES FIDELITY & GUARANTY CO.

### No. 9659.

Court of Civil Appeals of Texas. Austin.

Dec. 10, 1947.

Rehearing Denied Dec. 29, 1947.

Phillips, Horton & Williamson, and Travis Smith, all of Corpus Christi, for appellant.

Stafford & Carter, Tarlton Stafford, and John C. North, Jr., all of Corpus Christi, for appellee.

McCLENDON, Justice.

Workmen's compensation suit, in which the company (United States Fidelity & Guaranty Company, defendant below and appellee here) was the insurance carrier, M. A. & W. T. Cage, copartners, were the insured employers, and Stroud (deceased husband of plaintiff below and appellant here) was the employee. The appeal is from a judgment, non obstante veredicto, denying recovery. The question which controls the appeal is whether the evidence, viewed most strongly in favor of the verdict, supports the jury findings that Stroud was an employee of the Cages, and received the injuries resulting in his death while act-

ing in the course of such employment; and that he was not then the employee of an independent contractor.

The contentions of appellee are that the evidence conclusively shows that Stroud, at the time he received the fatal injuries:

1) Was the employee of an independent contractor;

2) Was not engaged in the course of any employment of the Cages; and

3) Was engaged in the performance of an act solely within the course of his employment by Hanks (his general employer), and not of the Cages.

The salient facts are these:

The Cages were engaged in the business of selling mud shell used principally for surfacing or resurfacing roads. Their plant was located in Corpus Christi; and at that time they were supplying shell for surfacing a road under construction by the county. The shell was then being hauled from their plant in motor driven dump trucks and delivered to the county by being dumped upon the roadbed at a point designated by an employee of the county. The Cages owned no dump trucks; and the hauling from their plant to the delivery point was in trucks owned either by the drivers, or by others who supplied the drivers. The Cages paid the truck owners by the cubic yard of shell hauled based upon the mileage of the haul. The truck drivers (where not the truck owners) were paid by the owners on the basis of ⅓ of the amount paid by the Cages to the owners. In addition to the drivers and the trucks the owners furnished the motive power (gas and oil), and kept the trucks in repair and running order. The owners were notified by the Cages when to supply the trucks. Usually they were required to be at the loading plant at about 7 a.m. From that time until they had completed their hauling for the day they were under the direction of the Cages. Specifically the Cages directed them when to "spot" their trucks at the loading chute, where the loading was done by employees of the Cages, who determined the amount of the load. They were directed by the Cages as to the route they were to travel, that the trucks should keep together, should avoid heavy traffic, and drive care-

fully so as to avoid accidents. One of the Cages testified that this direction was to obviate the firm's involvement in lawsuits. At the point of delivery an employee of the county directed the place on the road where the load was to be dumped. Tickets in duplicate were given to the drivers by the Cages, one of which was given by the driver to the recipient of the load, and the other, signed by the recipient, was returned by the driver to the Cages. The owners were paid on the basis of these receipted slips. Neither the owners nor the drivers were on the pay roll of the Cages, and were not listed in reports to the insurer as a basis for computing premiums upon the policy. When no one else was present to answer the telephone at the Cages' loading plant, the truck drivers would take the message, note it on a scratch pad, and call it to the Cages' attention. Drivers had no authority to accept orders for shell or to direct their fulfilment. Prior to their reporting at the loading plant and after completion of hauling for the day, the Cages had no control whatever over the drivers, whether or not they were the owners of the trucks. Hanks owned a number of trucks, and was engaged in the business of trucking for whomsoever would employ him. At the time in question he was supplying about four of his trucks for hauling shell for the Cages in connection with the above county road construction job. One of these trucks was usually driven by Hanks and another by Stroud, under the above arrangement. On the day in question it is not clear whether Hanks was ill. Hanks employed one of his drivers (Tomlinson), as foreman, at a salary of $25 per month, in addition to his earnings as driver, to take orders from the Cages regarding the time and number of trucks to have at the plant; and generally as foreman of the drivers regarding their employment by Hanks; but had no control over them (nor did Hanks) with reference to the hauling operations from the time they reported at the plant to the Cages until they had completed the hauling. The Cages had the right to discharge from the job any driver who did not perform his services satisfactorily to them; but they had no authority to discharge a driver from the employ of Hanks. Stroud had completed delivery of his last load for

the day, and was returning with his truck to a garage designated by Tomlinson as the place of storage for the night, when he was fatally injured by being crushed under the truck while he was engaged in the operation of greasing it from beneath with a grease gun.

■ If at the time of his fatal injuries Stroud had been engaged in the actual operation of hauling for the Cages, we would have difficulty in distinguishing the case in principle from that of the Owen case (Texas Employers' Ins. Ass'n. v. Owen, Tex. Com.App., 298 S.W. 542). The reports are replete with cases in which hauling by truck is under arrangements similar to that in suit. The Owen case was decided in 1927. The opinion is by Judge Speer, of the Commission of Appeals. It was not adopted, but the holding that the evidence supported a finding that the relation of master and servant existed between the one for whom the trucking was done and the driver, was essential to the judgment which was adopted, and which reversed that of the Court of Civil Appeals, 291 S.W. 940, and affirmed that of the District Court, and its approval was therefore implicit in the Supreme Court's adoption of the recommended judgment. See United North & South Oil Co. v. Meredith, Tex.Civ.App., 258 S.W. 550, affirmed Tex.Com.App., 272 S.W. 124. We do not find that the decision in the Owen case has ever been questioned by the Supreme Court. On the other hand there are several subsequent decisions which we find it difficult to reconcile in principle with the Owen case holding, in which the opposite result was reached. Particularly we cite the McLeod case (Security Union Ins. Co. v. McLeod, Tex.Com.App., 36 S.W.2d 449, an unadopted Commission opinion, Judge Ryan writing in 1931) and Smith Bros. v. O'Bryan, 127 Tex. 439, 94 S.W.2d 145 (an adopted Commission opinion by Judge German in 1936) ; and several other decisions of analogous import. This difficulty is illustrated by the majority and minority views of the justices of the Galveston Court in the above O'Bryan case Tex.Civ.App., 62 S.W.2d 505, and in Royal Indemnity Co. v. Blankenship, Tex.Civ.App., 65 S.W.2d 327. The general rule for determining whether a truck driver, using his own or another's truck, is an employee of the one for whom the hauling is being done or an independent contractor, seems well established. Judge German in the O'Bryan case adopts as "the simplest and perhaps the most accurate definition, abstractly speaking, of an independent contractor * * * that suggested by the annotator in 'General discussion of the nature of the relationship of employer and independent contractor' in 19 A.L.R. pp. 226 to 275," [127 Tex. 439, 94 S.W.2d 148] as follows: "An independent contractor is a person employed to perform work on the terms that he is to be free from the control of the employer as respects the manner in which the *details* of the work are to be executed." (Emphasis added.)

■ The difficulty in applying this definition is in ascertaining what are the details of the work, the control of the manner of whose execution is determinative of the relation between the workman and the recipient of the work. Even in the simplest employment of unskilled labor it is rarely practical for the master to direct every detail of the employment, even though, theoretically, he may have the right of direction. On the other hand there is an infinite variety of situations in which employment for a specific task should not create the legal relation of master and servant. The fact that the work is performed with tools, implements or machinery furnished, kept in repair and supplied with motive power by the workman or his general employer, while it may constitute an evidentiary circumstance, is not a controlling criterion. See the recent case of Hilgenberg v. Elam, Tex. Sup., 198 S.W.2d 94. It is interesting to note that in neither of the Commission opinions in the O'Bryan and McLeod cases is the Owen case referred to.

■ Regardless of the legal relation between Stroud and the Cages while he was actually engaged in the hauling for them, it is clear that he was in the general employ of Hanks, and if the relation of master and servant existed between him and the Cages it was only in the capacity of a borrowed servant of Hanks. Whatever control or right of control inhered in the Cages under the employment arrangement ended

when he had delivered the last load of shell for the day and was returning the truck to the garage designated by Hanks or his foreman, Tomlinson; whose control over him at that time and in the work in which he was then engaged was exclusive. He was then not the servant of the Cages, nor was he engaged in the performance of any act within the scope of his employment with them. For a discussion of this subject and citation of authorities see Hilgenberg v. Elam, above.

The trial court's judgment is affirmed.

Affirmed.